Minute Order Form (06/97)

15-6

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James B. Zagel | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 2245 | **DATE** | 5/14/2003 |
| **CASE TITLE** | DINO TITONE vs. JERRY STERNES | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] **The petition for a writ of habeas corpus is denied.**
(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | MAY 15 2003 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | 15 |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | FILED FOR DOCKETING | MAY 15 2003 | |
| DW | courtroom deputy's initials | 03 MAY 14 PM 7:24 | date mailed notice | |
| | | Date/time received in central Clerk's Office U.S. DISTRICT COURT | mailing deputy initials | |

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. DINO TITONE, <br><br> Petitioner, <br><br> v. <br><br> JERRY STERNES, <br><br> Respondent. | No. 02 C 2245 <br> Judge James B. Zagel <br><br> DOCKETED <br><br> MAY 1 5 2003 |

### MEMORANDUM OPINION AND ORDER

This habeas case is part of the fall out from the conviction of Thomas Maloney, once a prominent defense lawyer in criminal cases and then a long-time judge sitting in the Criminal Division of the Circuit Court of Cook County, who was convicted of taking bribes from criminal defendants and sent to federal prison. After his conviction many of the judgments in the cases over which he presided were challenged, this being one of them. In a post-conviction hearing, there was evidence that Titone's trial counsel told him that the Judge Maloney could be bribed to find him not guilty. Titone's father said that he was told that the amount required was $60,000, but after declaring that he could not come up with that amount, the attorney told the father that he had made a deal with the judge to take care of the matter for $10,000. The father further testified that he paid that amount to the attorney, and there was evidence that the attorney paid Judge Maloney $10,000 to find the defendant not guilty. After the money was paid, however, Judge Maloney learned that he was under investigation. He subsequently returned the money, convicted the petitioner after a bench trial, and sentenced him to death, presumably in an effort to protect himself from bribery and conspiracy charges. This evidence satisfied a very able and experienced



circuit judge at the criminal courts who granted the post-conviction petition and ordered a new trial. Nonetheless, Titone was convicted on retrial by a jury and received life imprisonment. At this point, his state appeals have failed, and he has exhausted all state remedies.

The facts of the case are set out in the Appellate Court's decision in *People v. Titone*, 505 N.E.2d 300, 300-01 (Ill. App. Ct. 1986):

> The principal witness for the People at trial was Katherine De Wulf, who testified that between 10:30 and 11 p.m. on December 11, 1982, she received a telephone call at her home in Chicago from her boyfriend, Robert Gacho, who told her to come to his house because he needed "a back-up car." At approximately 1:45 a.m., she received a second call from Gacho, who directed her to wait five minutes, then drive to his house. As instructed, she drove to Gacho's house, parked in the alley at the rear, and waited. Gacho came out of the house, told her to wait, and went back into the house. Joe Sorrentino, who Ms. De Wulf had known previously and who was a friend of Gacho's, left the house, went around the front of the house, and returned to the alley driving a light blue Toronado. He told her to stay in her car, and reentered the house.
> Shortly thereafter, Sorrentino again came out of the house; Fratto and Infelise, with their hands tied behind their backs, were with him. Ms. De Wulf recognized Fratto and Infelise from having seen them at Gacho's body shop. Defendant was walking behind Sorrentino, Fratto, and Infelise. Defendant motioned for Fratto and Infelise to get into the rear seat of the Toronado; defendant entered the passenger side and Sorrentino entered the driver's side. Gacho then came out of the house and entered the passenger side of Ms. De Wulf's car and told her, "They were going to have to waste 'em." Ms. De Wulf drove her vehicle and followed the Toronado being driven by Sorrentino. After a block or two, Gacho and De Wulf switched positions and Gacho drove. The two automobiles proceeded south on the Stevenson Expressway (I-55) for approximately one-half hour, leaving the expressway at the Kingery Road exit. Gacho and Ms. De Wulf followed the Toronado down a gravel or dirt road for about 10 or 20 minutes and stopped when the Toronado turned down another road. Gacho told Ms. De Wulf they were waiting to hear shots. Ms. De Wulf testified she heard "several" shots. Defendant and Sorrentino returned to Ms. De Wulf's automobile and Gacho queried, "Is it over?" She testified that defendant responded, "They're gone, they're dead, he had shot them." Defendant also responded that Fratto and Infelise were begging him not to shoot them. At this, Sorrentino and defendant "just laughed."
> Du Page County Forest Preserve Ranger Robert Stanton testified that at approximately 9:15 a.m. on December 12, 1982, he was patrolling the area of the Des Plaines River near Lemont Road when he observed a white automobile parked near the river. He approached the car and heard sounds coming from the trunk and a voice from the trunk saying, "I'm running out of air. Please get me out of here." Stanton radioed for

2

assistance, and both the Lemont police and fire departments responded. Within a minute or two, the trunk was forced open and Stanton observed two people in the trunk, covered with blood, and with their hands tied behind their backs. He also saw a hand gun in the trunk. Paramedics then removed one victim, later identified as Tullio Infelise, placed him on a stretcher, and removed the cord from his hands. Stanton asked Infelise, "Who did this to you?" Although Stanton testified it was difficult to understand exactly what he was saying, Infelise responded, "Robert Gott or Gotch." When asked where Gotch could be found, Infelise responded, "Florida."

It was stipulated that Infelise remained at Good Samaritan Hospital in Downers Grove from December 12, 1982, until he died on December 28, 1982. Apparently when the paramedics arrived at the scene, Fratto was dead.

An autopsy performed on Tullio Infelise showed that he died as a result of multiple gunshot wounds to the chest and abdomen requiring extensive surgical repair. The autopsy performed on Aldo Fratto showed that he died as a result of five gunshot wounds to the head, chest and abdomen. Forensic tests showed that the .38-special-caliber Smith & Wesson airweight-model revolver and the .25-ACP-caliber Raven Arms semi-automatic pistol found at the crime scene were used to inflict the fatal wounds. A latent fingerprint examination showed that the latent prints lifted from the crime scene were not defendant's.

As at the first trial, Titone's defense was alibi. Robert Caparelli, his brother-in-law said that Titone was playing cards with him and two others at the time of the offense. One of the other two men corroborated this alibi (as did the third man who testified at the first trial but was deceased at the retrial). Titone testified to the same effect. He explained that he was not a stranger to DeWulf and Gacho, and that on a date prior to the murder for which he was on trial, he met the two of them in a motel room. They asked for his help in stealing a large quantity of cocaine, which he declined.

One difference between the first and second trial was the testimony of Judy Macedo. According to the Appellate Court:

> [she] testified that back in 1982 she was married to Bob Gacho, who at the time was a truck driver for Charmichael Cartage. On December 11, 1982, she was at home with her husband and two children when defendant and Joe Sorrentino came to their house. They spoke with her husband in the dining room while she went into her bedroom and laid down. From where she was situated she could hear portions of the conversation. She

3

> heard them talking about Tullio and Aldo bringing large quantities of cocaine over to the house. She heard her husband say that he wanted the money in order to move away. She heard defendant say he was only interested in the drugs. She later heard the doorbell ring. Her husband answered the door, and Tullio and Aldo came in. She then detected an odor of cocaine. Later in the evening she discovered that everyone had left the house. She admitted that during the first trial in 1984 she committed perjury when she testified that she had never met defendant and no one came by her house on December 11, 1982. She testified that she had lied at the first trial because her husband and his lawyer told her to, and she was afraid. She also admitted that prior to the second trial she told the assistant State's Attorney that she did not remember testifying in 1984 because she did not want to remember.

*Id.*

Titone now raises several challenges to his final conviction. First, he says that constitutional error occurred when an alibi witness was asked whether he formerly worked for an "outfit" named Charmichael Cartage. Even if habeas corpus review was *de novo*, this argument would fail. There is no showing–other than the assertion of petitioner and counsel–that a jury in Cook County would infer from this the suggestion that the alibi witness and, by extension, the petitioner were associated with organized crime. The Appellate Court said it did "not ascribe the negative connotations to that word which defendant would have us do," *id.*, and I am unwilling to take judicial notice that the word "outfit" used in this context and used only once would be understood as a reference to organized crime. Unlike the words "syndicate" and "Mafia," there is relatively little use of the word "outfit" to refer to organized crime in published works. In addition, the most prominent examples that do exist were published after the date of the trial. *See e.g.*, Gus Russo, *The Outfit* (Bloomsbury 2003).[1] In any event it is quite impossible to say that the

---

[1] One of the ironies here is that petitioner claims that "outfit" has a particularly pernicious effect on a defendant with an Italian name while Russo's text points out that a distinguishing feature of the Outfit was that its membership and leadership contained many who were not Italian-American.

4

Appellate Court's decision was contrary to or an unreasonable application of the law established by the United States Supreme Court. *Williams v. Taylor*, 529 U.S. 362 (2000).

There are two claims of constitutional errors in the jury instructions regarding weighing the testimony of an accomplice and that of an admitted perjurer. These are state law claims without constitutional dimension, but they are not even good state error claims because the Appellate Court has clearly shown that adequate instructions were given with respect to accomplices and perjurers. There is no contrary Supreme Court precedent, and it is doubtful that there ever will be. Even a complete failure to instruct a jury on perjurer's testimony strikes me as less than fundamental error. If a jury needs to be told that the testimony of an admitted perjurer has to be judged carefully, then one doubts the competency of juries to sit and decide any case.

Much is made of the failure to grant a continuance on the ground that it was one day before trial that defense counsel was given a statement of Judy Machado. Titone claimed surprise and wanted to investigate facts which would cast doubt on her credibility. One problem with this argument is that petitioner has now had time to do such an investigation and thus demonstrate what facts he missed and what their value would have been. But there is no showing of prejudice. There is only the theoretical possibility that such evidence could have been discovered, and it is quite theoretical because I doubt that counsel could ever have come up with facts better than the witness' admission that she perjured herself at the first trial and lied to everyone until a day or two before trial. Defense counsel had, in any event, months of notice that she was on the witness list and could have investigated before the day before trial. Had he done so he might have learned (even before the prosecution did) that she was going to change her testimony. But this is not the heart of the matter. There is no practical prejudice that appears in the record and no subsequent

showing of prejudice. Continuances are usually in the discretion of the court and there is thus little Supreme Court precedent on denial of continuance. The little precedent that exists concerns even graver problems for defense counsel than the one found here, and, even so, that precedent is not helpful to petitioner. *See Avery v. State of Alabama*, 308 U.S. 444 (1940); *Morris v. Slappy*, 461 U.S. 1 (1983). What law there is was not misapplied by the state court. *Williams v. Taylor*, 529 U.S. 362 (2000).

Titone also raises three due process contentions regarding the testimony of Kathryn De Wulf. One is that he should have been given more data about her in discovery, but he did receive the pre-trial discovery mandated by state law, which goes beyond what is constitutionally required. *See Pennsylvania v. Ritchie*, 480 U.S. 39 (1987); *United States v. Augenblick*, 393 U.S. 348 (1969). The second concern is that the jury heard that De Wulf had made a prior consistent statement, which Titone claims is a violation of the hearsay rule. However, there is no Supreme Court case – and perhaps no case from any court – which has held that such a minor violation of the hearsay rule (minor because the defendant still had the right to cross-examine the declarant about the statement) is a constitutional violation. Indeed the best case for petitioner is *Tome v. United States*, 513 U.S. 150 (1995), but it is not even based on constitutional requirements. Titone's final due process concern is the denial of the right to ask certain questions, but the Appellate Court found no prejudice in this denial because the theory that the defense was trying to use with respect to this witness was supported by her answers to other questions that brought out the facts sought by the refused questions. In sum, the Appellate Court did not misapply the Supreme Court jurisprudence in any of its rulings regarding the De Wulf issues. *Williams v. Taylor*, 529 U.S. 362 (2000).

Along with the above challenges, there is a confrontation claim. After speaking to Tullio Infelise on two occasions, an officer said "we proceeded to try to find the individuals who had been named as the perpetrators in the crime, the shooters." There was no objection, but the officer was asked if he and others began to look for certain individuals, and to this an objection was made and overruled. Then the officer testified that they went looking for Titone and his accomplices. This point is troublesome, but the Appellate Court did not rule in a way that is contrary to Supreme Court jurisprudence. *Williams v. Taylor*, 529 U.S. 362 (2000). First, it found that the evidence was offered for the purpose of explaining police conduct, which, in a case like this, is not a trivial purpose. Because of the alibi defense, the investigators were subject to an attack that they picked petitioner at random since they had no good reason to suspect him when they went out to arrest him. More importantly, they found, as did the state supreme court, that Infelise's statement was a spontaneous declaration admissible under an exception to the hearsay rule. Such exceptions are constitutional. *Bourjaily v. United States*, 483 U.S. 171 (1987); *Idaho v. Wright*, 497 U.S. 805 (1990).

Finally, the petitioner challenges the sixteen-year delay between his first flawed trial and his retrial. The delay was a failure by the court and not by the prosecution, but court delays, even over vociferous objections by prosecutors, can still deny the right to a speedy trial. It is the duty of the court – not the prosecutor – to provide a speedy trial. This would be a winning argument for petitioner but for the fact that he bribed the judge at his first trial. He, as much as the judge, was therefore responsible for the delay. It is difficult to comprehend how it would come to be that the United States Supreme Court would conclude that a petitioner like this one is not

responsible for the delay in giving him a proper trial. This was the conclusion of the Appellate Court and it is mine as well.

For the reasons above, Titone's Petition for a Writ of Habeas Corpus is denied.

ENTER:

*James B. Zagel* (signature)

James B. Zagel
United States District Judge

DATE: MAY 1 4 2003